## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

KATHLEEN M. LYNCH,          )
                                   )
       Plaintiff,         )
                                   )
    vs.               )     **Case No. 4:10-CV-01035NAB**
                                   )
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,   )
                                   )
       Defendant.     )

## MEMORANDUM OPINION

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Michael Astrue ("Defendant") denying the application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 - 434, filed by Kathleen M. Lynch ("Lynch"). [Doc. 1]. Lynch filed a Brief in Support of the Complaint. [Doc. 10]. Defendant filed a Brief in Support of the Answer. [Doc. 15]. Lynch filed a Reply. [Doc. 19]. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1). [Doc. 16].

## I.
## PROCEDURAL HISTORY AND
## FACTUAL BACKGROUND

On July 17, 2006, Lynch protectively filed an application for Disability Insurance Benefits. (Tr. 98-102). Lynch's claim was denied on October 25, 2006. (Tr. 56-61). Lynch timely filed a written request for a hearing by an Administrative Law Judge ("ALJ"). (Tr. 64). The ALJ held a hearing on May 27, 2008. (Tr. 23-53). The ALJ denied Lynch's application in a decision dated June 11, 2008. (Tr. 10-22). On April 8, 2010, the Appeals Council denied

Lynch's request for review.  (Tr. 1-3).  As such, the decision of the ALJ stands as the final

decision of the Commissioner.

At the time of the hearing, Lynch was forty-one years old.  (Tr. 25).  She was married

with two children.  (Tr. 29).  She received a B.S. in Nursing in 1990, and worked as an RN

between 1990 and 1999.  (Tr. 25, 135).

## II.
## EVIDENCE BEFORE THE ALJ

### A.  Testimony at the Hearing

At the hearing, the ALJ heard testimony from Lynch, her husband and vocational expert

Vincent Stock ("VE").

### 1.  Lynch's Testimony

Lynch testified that she had anxiety as a child.  (Tr. 29).  She began seeing psychiatrists

and taking medication for anxiety after she turned seventeen or eighteen years old.  *Id.*  She

stated that she was "still able to do activities of daily living" and work despite her anxiety.  (Tr.

30).  She testified that her anxiety condition improved with treatment until she fell from a tree in

1998.  (Tr. 31).  Lynch suffered a broken wrist in the fall.  (Tr. 26).  She also claimed the fall

caused her mental problems.

Lynch stated that she was "living in the now" the first year after the fall.  (Tr. 33).  She

felt "great" during that time and had no anxiety, but she could not remember what she going to

do or what she had just done.  *Id.*  She would forget about what she had just talked about with

someone and frequently had to repeat herself.  *Id.*  Her anxiety returned around August of 1999.

(Tr. 34).  She stated that her personality changed and she stopped socializing with people.  (Tr.

35).  Her anxiety prevented her children from having friends come to their home because it

"unnerved [her] to have anybody else in the house."  *Id.*

Lynch stated that she suffered a "repeat head trauma" in a car accident in 1999.  (Tr. 27).

She did not go to the emergency room or seek medical treatment immediately after the car

accident.  *Id*.  Lynch acknowledged that she did not seek any treatment between January of 2002

and April 2005.  *Id*.  She stated that she was "strictly on medication at that point" and continued

to obtain refills.  *Id*.  She stated that she did not seek treatment because she felt that her problems

were attributable to her diabetes diagnosis and she didn't realize it was related to her anxiety

disorder.  *Id*.

Lynch testified that she has suffered nightmares since she was raped at age fifteen.  (Tr.

39).  Her anxiety and nightmares increased after her fall in 1998.  (Tr. 40).  She stated that

doctors have "always" diagnosed her with depression.  *Id*.  She has thoughts about killing

herself.  *Id*.  She had urges to cut herself after the fall in 1998.  (Tr. 41).  Lynch also testified that

she has obsessive traits such as checking and re-checking the alarm clock, doors, and windows.

(Tr. 42).  She stated this got a lot worse after the fall.  *Id*.

Lynch suffered Bell's Palsy in 1999 and she testified that she still has some problems

with the left side of her face as a result of Bell's Palsy.  (Tr. 28).  Lynch testified that her

hypertension is controlled by medication.  (Tr. 29).

## 2.  Lynch's Husband's Testimony

Lynch's husband testified that Lynch was "living in the now" after her fall.  (Tr. 44).  She

experienced short-term memory problems which affected her abilities to hold conversations and

complete tasks.  (Tr. 45).  Lynch would forget to take laundry out of the washing machine and it

would have to be re-done.  *Id*.  She did not have this problem before her fall.  *Id*.  Lynch became

"very reclusive" after the fall.  *Id*.  Lynch began having trouble leaving the house.  *Id*.  She could still

drive herself to the grocery store.  (Tr. 46).  Lynch would purchase the same item multiple times,

such as eight tubes of toothpaste or three or four deodorants.  *Id*.  Lynch stopped participating in

family outings.  *Id.*  Lynch's husband also testified that Lynch experiences nightmares and does not sleep through the night.  (Tr. 47).

### 3.  Vocational Expert's Testimony

The ALJ presented the following hypothetical to the VE:

> "[W]e have a hypothetical claimant age 30 with an alleged date of onset with 16 years of education, same past work experience as Miss Lynch.  It's been opined this hypothetical claimant is able to lift and carry up to twenty pounds occasionally, ten pounds frequently, stand or walk for six hours out of eight, sit for six and, occasionally climb stairs or ramps, never ropes, ladders or scaffolds.  Should avoid concentrated exposure to hazards of unprotected heights.  In addition, this hypothetical claimant is able to understand, remember and carry out at least simple instructions and non detailed tasks.  Can respond appropriately to supervisors and coworkers in a task oriented setting or contact with others is casual and infrequent, and should not work in a setting which includes constant or regular contact with the general public."

(Tr. 48-49).  The VE testified that this hypothetical claimant could not return to past relevant work as RN.  (Tr. 49).  However, the VE testified that both housekeeping and masker of semiconductor positions were examples of available work for a claimant with the specified restrictions.  *Id.*

The second hypothetical posed to the VE included the same restrictions as the first except the lifting requirements were changed to ten pounds occasionally and less than ten pounds frequently.  (Tr. 50).  The VE testified that positions available for a claimant with those restrictions included a night clerk at a hotel and a line fabricator.  *Id.*

### B.  Medical Records

On June 3, 1998, Lynch began psychiatric treatment with Dr. David Berland, M.D. ("Dr. Berland"), for help with panic attacks and anxiety.  (Tr. 352).  Lynch informed Dr. Berland of a past diagnosis of Asperger's Syndrome, flashbacks and nightmares from a rape at age fifteen, depression as a teenager, ongoing panic attacks, and increasing anxiety.  (Tr. 329-30).  Dr.

Berland's initial impression included Asperger's Syndrome, post traumatic stress disorder, generalized anxiety disorder, and depression.   (Tr. 331).

On average, Lynch sought treatment from Dr. Berland twice monthly during June, July and August of 1998.  (Tr. 349-52).  On June 5, 1998, Lynch reported she was drowsy but had lower anxiety.  (Tr. 351).  On July 2, 1998, Lynch reported that she was doing well on her medication, but noted that both her nightmares and good dreams were more vivid.  (Tr. 350).  On July 23, 1998, Lynch reported having a terrible night and that her anxiety worsened at night.  *Id.* However, on August 20, 1998, Lynch reported to Dr. Berland that she was doing better.  (Tr. 350-51).

On August 22, 1998, Lynch was admitted to Barnes-Jewish Hospital following a fifteen foot fall from a tree. (Tr. 189).  Her left wrist was splinted due to evidence of a fracture, but all studies performed during Occupational, Physical and Speech therapy consultations, as well as a CT scan of the head and an x-ray of the cervical spine, were negative and Lynch was discharged on August 24, 1998 in a significantly improved condition.  *Id.*

Dr. Berland's treatment notes dated August 31, 1998 indicated that Lynch was recovering from a broken wrist and head injury suffered in the fall from the tree.  (Tr. 349).  Dr. Berland also noted decreased cognitive changes.  *Id.*  Lynch did not return to Dr. Berland until October 1, 1998.  *Id.*  On October 1, 1998, Dr. Berland noted that Lynch's short term memory was better, her response time from thought to muscle movement had increased, she was worrying less and was concerned more about her husband than herself.  *Id.* Lynch did not see Dr, Berland again until January 29, 1999.  *Id.*

In February of 1999, Lynch was in a car accident, but she did not go to the emergency room or seek medical treatment immediately after the car accident.  (Tr. 27).   On March 5,

1999, Dr. Berland noted that Lynch had an "exacerbating car accident" a month prior to the evaluation.  (Tr. 348).  He noted that Lynch's mood was up, she still was experiencing short term problems but was doing well, and she was not currently working as a nurse.  *Id*.  On May 10, 1999, Dr. Berland's notes indicate that Lynch was not having suicidal thoughts, but her fatigue and allergies were worse, and she was feeling angry towards her husband.  (Tr. 347-48).

On July 13, 1999, Lynch sought treatment for migraine headaches from Dr. Gerlyn Friesenhahn, M.D. ("Dr. Friesenhahn").  (Tr. 283).  Dr. Friensenhahn noted that Lynch's mental status, speech, language, and gait were normal.  (Tr. 284).  Dr. Friensenhahn diagnosed Lynch with chronic tension headaches and menstrual migraines.  *Id*.  He recommended medication and requested Lynch follow up if she had any benefit or side effects.  *Id*.

On July 28, 1999, Lynch visited Richard W. Maack, M.D., with complaints of allergies and nasal spray addiction.  (Tr. 291).  Dr. Maack recommended Lynch to Dr. Michele Kemp for her allergies.  *Id*.

On August 9, 1999, Dr. Berland noted that the Lynch dwelled on her depression at times but that she was planning a vacation to Florida.  (Tr. 347).  On August 31, 1999, Dr. Berland noted Lynch "[h]ad episode of feeling so bad- even suicide thoughts on vacation! [S]he was even writing note!"  *Id*.  On October 15, 1999, Lynch reported feeling terrible and Dr. Berland prescribed Prozac.  (Tr. 346).  On November 3, 1999, Lynch visited Dr. Maack with complaints of ear pain and facial weakness.  (Tr. 287-88).  Dr. Maack's diagnosis was that Lynch's condition was "likely left Bell's Palsy."  (Tr.  288).  He prescribed Valtrex.  *Id*.

 On November 29, 1999, Lynch sought treatment from Gary M. Goodman, M.D. ("Dr. Goodman") for allergies.  (Tr. 224-25).  Dr. Goodman's initial impression indicated multiple drug allergies and possible exercise induced asthma.  *Id*.  Lynch was prescribed several

medications, however, no pulmonary study was ordered.  *Id*.  On December 4, 1999, Dr. Berland

noted that Lynch was "so anxious."  *Id*.  He also noted that Lynch had suffered Bell's Palsy.  *Id*.

On January 3, 2000, Lynch informed Dr. Berland that she was having crying spells and

could not cope with things.  (Tr. 346).  On January 28, 2000, Dr. Berland noted that Lynch's

daily tension headaches were gone and he prescribed various medications.  (Tr. 345).  On

February 8, 2000, Dr. Berland noted that that Lynch felt "much better" and could "focus [and]

concentrate."  (Tr. 344).  Lynch did not see Dr. Berland again until July 11, 2000. *Id.*

On July 11, 2000, Dr. Berland's treatment notes indicate that Lynch was redoing her

house which was "a lot of work."  *Id*.  She was also taking water aerobics.  *Id*.  She mentioned to

Dr. Berland that she had gone to a "happy hour" social event that "went well."  *Id*.  Dr. Berland

also noted that Lynch was more anxious.  *Id*.  Dr. Berland prescribed Ritalin, Celexa, and

Klonopin.  *Id*.  On September 21, 2000, notes indicate that Lynch's migraines returned and that

she had to stop her exercise classes because she was sick.  *Id*.  She was also having problems

keeping her house clean and it was filling up with "tons of saved paper."  *Id*.  On October 30,

2000, it was noted that Lynch was healing okay from a surgery performed on her finger.  (Tr.

343).

Lynch next saw Dr. Berland on January 3, 2001.  *Id*.  Lynch indicated that her energy

was too low to work and her headaches were barely under control.  *Id*.  Dr. Berland ordered her

to resume taking Prozac.  *Id*.  Throughout February 2001, Lynch reported feeling anxious and

panicky and having trouble sleeping.  *Id*.

On August 7, 2001, Lynch complained of trouble leaving her house and that some of her

medications were no longer working.  *Id*.  She was experiencing panic and feeling sweaty and

short of breath.  (Tr. 341).  On August 15, 2001, Lynch was "sleeping better, [having] no

nightmares [and her] moods were stable." *Id.*   Lynch did not return to Dr. Berland until January 16, 2002. *Id.*   Treatment notes from this visit indicate that Lynch was feeling aggressive. *Id.*   She also reported to Dr. Berland that she "phased out" or disassociated while driving to Six Flags. *Id.*   Dr. Berland recommended that Lynch "talk to a yoga teacher," he did not prescribe any medication. *Id.*   Lynch did not return to Dr. Berland until 2005. *Id.*   Lynch testified at the administrative hearing that during this gap she managed her condition with medication prescribed by Dr. Berland and her primary care physicians.  (Tr. 28).

The record contains voluminous treatment notes from various doctors from June of 2004 through 2008.[1]   The records show that Lynch re-established treatment with Dr. Berland in April of 2005 and routinely sought treatment from him through 2008 for increased anxiety, panic attacks, depression, confusion, and problems with concentration.  (Tr. 333-41).  Lynch also sought treatment from a number of neurological specialists, all of which noted normal neurological findings.  *See* (Tr. 282); (Tr. 312); (Tr. 219); (Tr. 587).

On  January 25, 2008, Dr. Berland opined that Lynch was unable to work at that time because she was unable to concentrate, focus her attention, read social cues or complete solitary tasks in an appropriate amount of time.  (Tr. 484). He stated that "[t]o  reasonable degree of medical certainty, based on her psychiatric conditions, I believe that Ms. Lynch is unable to work and will never be able to work." *Id.*

On May, 22, 2008, Dr. Berland completed a Medical Assessment form detailing Lynch's mental ability to do work related activities.  (Tr. 743-44).  Dr. Berland rated Lynch's ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stressors, function independently and maintain concentration in the

---

[1] As discussed in more detail below, the Court finds most of these treatment notes to be irrelevant because the records do not relate to Lynch's condition as it existed on or before her date last insured, March 31, 2004.

range of "poor to none."  (Tr. 743).  He rated Lynch's ability to carry out simple, complex or detailed job instructions in the range of "poor to none."  (Tr. 744).  He also rated Lynch's ability to behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability in the range of "poor to none."  *Id*.   Dr. Berland noted uncontrolled crying spells, racing thoughts, memory deficits, excessive worry and panic attacks as support of his assessment.  (Tr. 743-44).

On May 23, 2008, Dr. Berland again submitted an opinion that Lynch could not work. (Tr. 741-42).  In this opinion he noted that Lynch's mental functioning fluctuates and is unpredictable, therefore Lynch would be unable to know when she would be able to show up for work.  (Tr. 741). Dr. Berland opined that Lynch cannot remember or follow instructions, at times can be around no one due to her anxiety, she has distortions of reality and may believe that others are menacing, and she has episodes of losing track of time.  (Tr. 741-42). He stated, "[o]verall, to a reasonable degree of medical certainty, I believe that Ms. Lynch has been unable to work since 1998."  (Tr. 742).

On June 2, 2008, Dr. Berland provided a response to the Administrative Law Judge's request for additional information.  (Tr. 745).  He stated that the basis for his belief that Lynch could not work prior to January 16, 2002 was found in treatment notes indicting "house cluttered with tons of paper" on September 21, 2000, "anxiety persists - panicy [sic] around 3 pm" on February 1, 2000, and  "phased out - dissociated - [on highway 44] to 6 flags" and January 16, 2002.  *Id*.   Dr. Berland found these descriptions of activity to reflect a worsening anxiety disorder: the clutter indicates an obsessive-compulsive form of anxiety, then there is evidence of discrete panic attacks, and finally the anxiety becomes so severe that Lynch dissociates.  *Id*. However, Dr. Berland also conceded that Lynch did not seek treatment after her January 16,

2002 session until April 15, 2005.  *Id.*  Dr. Berland also conceded that his documentation lacked severity scales.  (Tr. 755).

### C.    Reports

On September 4, 2006, Lynch's husband completed a Third Party Function Report and indicated that Lynch was limited with lifting, stair-climbing, understanding, squatting, kneeling, talking, following instructions, seeing, completing tasks, walking, memory, and concentration. (Tr. 156)  He noted that Lynch wakes up due to pain and nightmares between the hours of 3:30 and 5:00 a.m. and sometimes sleepwalks.  (Tr. 158).  He also indicated that Lynch had difficulties with chores, problems with organization, distraction, and confusion, and her inability to go out alone contributed to confusion or fugue states.  (Tr. 159).

### III.
### ALJ DECISION

The ALJ found that Lynch last met the insured status requirements of the Social Security Act on March 31, 2004 and that through that date Lynch had the severe impairments of anxiety, diabetes mellitus, and obesity.  *Id.*  The ALJ determined that Lynch's migraines, hypertension, asthma, allergies, and rheumatoid arthritis were non-severe impairments.  (Tr. 15-16).

The ALJ found that Lynch did not have an impairment or combination of impairments that met or equaled the severity of an impairment in the Listings.  (Tr. 16).  He found that Lynch's allegations regarding the intensity, persistence and limitations of her symptoms were not credible and that the opinion of Lynch's treating physician was unreliable and contradictory. (Tr. 18, 20).

The ALJ found the Lynch had the RFC to perform "light work as defined in 20 C.F.R. 404.1567(b) except that she was unable to climb ropes, ladders, scaffolds and could only climb stairs and ramps occasionally and she had to avoid concentrated exposure to hazardous heights.

In addition, due to moderately impaired activities of daily living, social functioning and concentration, persistence and pace, the claimant was limited to jobs involving simple instructions and non-detailed tasks.  She was limited to occasional interaction with supervisors and co-workers and with no regular contact with the public."  (Tr. 17).  He found that the medical evidence in the record failed to support a more restrictive residual functioning capacity. (Tr. 19).

The ALJ found that Lynch was unable to perform past relevant work, but retained the ability to perform work other which existed in significant numbers in the national economy.  (Tr. 20-21).  Therefore, the ALJ found that Lynch was not disabled.  (Tr. 21).

## IV.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529.  "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'"  *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)).  In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b).  Second, the claimant must have a severe impairment.  20 C.F.R. §§ 416.920(c), 404.1520(c).  The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities … ."  *Id.*  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work."  *Page v. Astrue*, 484

F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1.  If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history.  *Id.*

Fourth, the impairment must prevent claimant from doing past relevant work.[2]  20 C.F.R. §§ 416.920(e), 404.1520(e).  At this step, the burden rests with the claimant to establish his or her Residual Functional Capacity ("RFC").  *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008).  *See also Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(b)-(e).  The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § 404.1520(f).  If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled.  *Id.*; 20 C.F.R. § 416.920(a)(4)(iv).  If the claimant cannot perform past relevant work, the analysis proceeds to Step V.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work.  20 C.F.R. § 416.920(a)(4)(v).  If it is found that the claimant cannot make an adjustment to other work, the

---

[2]  "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. § 404.1560(b)(1)).

claimant will be found to be disabled. *Id. See also* 20 C.F.R. § 416.920(g). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). The Commissioner must prove this by substantial evidence. *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." *Id. See also Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole. *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

As such, "[the reviewing court] may not reverse merely because substantial evidence exists for the opposite decision." *Lacroix v. Barnhart*, 465 F.3d 881, 885 (8th Cir. 2006) (quoting *Johnson*

*v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996)).  Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently.  *Krogmeier*, 294 F.3d at 1022.

It is not the job of the district court to re-weigh the evidence or review the factual record de novo.  *Cox*, 495 F.3d at 617; *Guillams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).  Weighing the evidence is a function of the ALJ, who is the fact-finder.  *Masterson v. Barnhart*, 363 F.3d 731, 736 (8th Cir. 2004) (citing *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987).  The factual findings of the ALJ are conclusive if supported by substantial evidence.  See 42 U.S.C. § 405(g).  The district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion.  *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001) (citing *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980); *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989).  Additionally, an ALJ's decision must comply "with the relevant legal requirements." *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  A claimant's subjective complaints may not be disregarded solely because the objective medical evidence does not fully support them.  *Id.*  The absence of objective medical evidence is just one factor to be considered in evaluating the claimant's credibility and complaints.  *Id.*  The ALJ must fully consider all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions

15

*Id.*  The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the claimant's complaints.  *Guillams*, 393 F.3d at 802; *Masterson*, 363 F.3d at 738.  "It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence."  *Id.* (citing *Butler v. Sec'y of Health & Human Servs.*, 850 F.2d 425, 429 (8th Cir. 1988)).  The ALJ, however, "need not explicitly discuss each *Polaski* factor."  *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004); *see also Steed*, 524 F.3d at 876 (citing *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000)).  The ALJ need only acknowledge and consider those factors.  *Id.*  Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence.  *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988); *Millbrook v. Heckler*, 780 F.2d 1371, 1374 (8th Cir. 1985).

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used.  An ALJ posing a hypothetical to a vocational expert is not required to include all of a claimant's limitations, but only those which he finds credible.  *Goff*, 421 F.3d at 794 ("[T]he ALJ properly included only those limitations supported by the record as a whole in the hypothetical"); *Rautio*, 862 F.2d at 180.  Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the claimant's subjective complaints of pain for legally sufficient reasons.  *Baker v. Barnhart*, 457 F.3d 882, 894-95 (8th Cir. 2006); *Carlock v. Sullivan*, 902 F.2d 1341, 1343 (8th Cir. 1990); *Hutsell v. Sullivan*, 892 F.2d 747, 750 (8th Cir. 1989).

## V.
### DISCUSSION

Lynch raises four points of error in arguing that the ALJ's decision is not supported by substantial evidence.  First, Lynch claims the ALJ committed legal error in failing to make specific findings regarding her physical limitations in the determination of her RFC and that the

16

RFC finding is not supported by substantial evidence.  Second, Lynch contends the ALJ

improperly rejected the opinion of her treating physician.  Third, Lynch argues the ALJ failed to

make specific findings regarding her depression and Asperger's Syndrome.  Fourth, Lynch

claims the ALJ failed to discuss, analyze, and make a credibility determination regarding

testimony from her husband.  The court will address each point of error in the order presented.

As an initial matter, the Court notes that a claimant is eligible for disability insurance

benefits "where she demonstrates disability on or before the last date for which she [was]

insured."  *Sneed v. Barnhart,* 214 Fed.Appx. 883, 884 (11th Cir. 2006) (per curiam)

(unpublished) (citing 42 U.S.C. § 423(a)(1)(A) (2005); *see also Fowler v. Bowen*, 866 F.2d 249,

252 (8th Cir. 1989) (disability must be evaluated as of the date last insured).  Lynch's last date

insured was March, 31, 2004.  Therefore, in order to be entitled to disability insurance benefits,

she is required to show the existence of a disability on or before March 31, 2004.  *See Sneed*, 214

Fed.Appx at 884.

### A. Determination of Lynch's RFC

Lynch claims the ALJ erred by expressing her RFC in terms of "light work" and failing

to make specific findings regarding limitations on lifting, carrying, pushing, pulling, sitting,

standing, and walking.  Lynch further claims the RFC assessment is not supported by substantial

evidence.  The Court disagrees.

"The RFC 'is a function-by-function assessment based upon all of the relevant evidence

of an individual's ability to do work-related activities.'" *Masterson*, 363 F.3d at 737 (quoting

SSR 96-8p).  It is the claimant's burden to establish her RFC.  *Id.*  It is the ALJ's responsibility

to determine the claimant's RFC based on all relevant evidence, including medical records,

observations of treating physicians and the claimant's own descriptions of his or her limitations.

17

*Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).  The ALJ must specifically set forth the claimant's limitations, both physical and mental, and determine how those limitations affect the claimant's RFC.  *Pfitzner v. Apfel,* 169 F.3d 566, 568 (8th Cir. 1999).  Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question.  *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional.  *See Lauer*, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC).  An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record.  *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

Here, the ALJ found that Lynch had the RFC to perform light work except that she was unable to climb ropes, ladders, scaffolds and could only climb stairs and ramps occasionally; she had to avoid concentrated exposure to hazardous heights; she was limited to jobs involving simple instructions and non-detailed tasks; and she was limited to occasional interaction with supervisors and co-workers and no regular contact with the public.  (Tr. 17).  Lynch takes issue with this finding because she contends the ALJ initially expressed her RFC in terms of an exertional category and failed to make findings regarding lifting, carrying, pushing, pulling, sitting, standing, and walking.

SSR 96-8p states that the RFC should not be expressed initially in terms of an exertional category.  *See* SSR 96-8p.  However, it is well established that "an arguable deficiency in opinion-writing technique does not require [the court] to set aside an administrative finding when that deficiency had no bearing on the outcome."  *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992) (internal quotation omitted); *see also Owen v. Astrue*, 551 F.3d 792, 801 (8th

18

2008).  Here, the ALJ's initial reference to Lynch's "light work" RFC was made in the heading of the section in which the ALJ examined Lynch's RFC.  Following the heading, the ALJ engaged in a thorough, three-page discussion of the evidence used to determine the RFC.  As discussed in more detail below, the Court finds substantial evidence supports the overall RFC determination.  Therefore, the ALJ's "deficiency in opinion-writing technique" had no bearing on the outcome of the case.  *See Robinson*, 956 F.2d at 841.

Similarly, Lynch's argument regarding the ALJ's failure to make findings regarding lifting, carrying, pushing, pulling, sitting, standing, and walking also fails.  Although it is preferred that an ALJ make specific findings as to each function, an ALJ's failure to make such findings does not necessarily indicate that the ALJ overlooked the functions for which he does not make specific findings.  *See Depover v. Barnhart*, 349 F.3d 563, 567 (8th Cir. 2003).  In *Depover*, the court determined that the record may contain evidence from which a court may find that the ALJ made implicit findings regarding functions not specifically mentioned in the RFC determination.  *Id*.  In determining that the ALJ "implicitly found" that the claimant was not limited in the functions of sitting, standing, and walking, the *Depover* court relied on the fact that "all of the functions that the ALJ specifically addressed in the RFC were those in which he found a limitation, thus giving [the court] some reason to believe that those functions that he omitted were those that were not limited."  *Id*.  The court also noted that the hypothetical posed to the VE included limitations on sitting, standing, and walking.  *Id*.  The court therefore concluded that "the ALJ did not simply overlook the possibility that [the claimant] was limited in the functions of sitting, standing, or walking when he stated his RFC."  *Id*.

Here, like *Depover*, all of the functions addressed by the ALJ in the RFC determination are those in which the ALJ found a limitation.  Also, like *Depover*, the hypothetical posed by the

ALJ to the VE included most of the functions which Lynch claims the ALJ failed to consider.

The first hypothetical posed by the ALJ to the VE included the following statement:

> It's been opined this hypothetical claimant is able to lift and carry up to 20 pounds
> occasionally, 10 pounds frequently, stand or walk for six hours of eight, sit for
> six, and occasionally climb stairs and ramps, never ropes, ladders or scaffolds. . . .

(Tr. 75-76).  In the second hypothetical, the ALJ lowered the lifting requirements to "ten pounds

occasionally, [and] less than ten pounds frequently."  The other specifications remained the same

as the first hypothetical.  (Tr. 77).  The hypotheticals therefore indicate that the ALJ considered

the functions of lifting, carrying, sitting, standing, and walking, and did not overlook those

functions in making the RFC determination.  *See Depover*, 349 F.3d at 567.  Also, in analyzing

the severity of Lynch's rheumatoid arthritis, the ALJ noted that "there is no convincing evidence

in the record indicating any significant physical limitations associated with possible rheumatoid

arthritis."  (Tr. 43).  This is further evidence that the ALJ considered all of Lynch's physical

limitations.  The Court therefore believes the ALJ implicitly found that Lynch was not limited in

the functions of, carrying, sitting, standing, and walking.  *See Id.*

The Court finds no indication in the record that the ALJ considered the functions of

pushing and pulling.  However, Lynch claimed that her ability to work was limited by

"[c]omplications from [a] head injury and mental illness."  *See* (Tr. 132).  She did not allege any

physical limitations in her disability report and she did not mention any physical limitations

during the hearing before the ALJ.  Further, Lynch points to no evidence in the record that

establishes that she was limited in her abilities to push and pull before her date last insured.

Therefore, the Court finds that the ALJ's failure to address pushing and pulling did not affect the

determination and does not warrant reversal.  *See Robinson*, 956 F.2d at 841 (Arguable

20

deficiency in opinion-writing technique does not require reversal when that deficiency had no bearing on the outcome).

Lynch also argues that the ALJ's RFC determination is not supported by substantial evidence in the record as a whole.  Again, the RFC determination is an assessment of an individual's ability to do work-related activities, s*ee Masterson*, 363 F.3d at 737, and is a medical question. *See Hutsell*, 259 F.3d at 711 (citation omitted).  In this case, the focus is not on Lynch's current ability to do work-related activities, but rather on her ability to do work-related activities as of March 31, 2004, her date last insured.  *See Fowler*, 866 F.2d at 252.  Having reviewed the evidence in the record, the Court finds the ALJ's RFC determination is supported by substantial evidence.

The record indicates that Lynch was hospitalized for two days in August of 1998 and treated for a broken wrist and a head injury, both which resulted from a fall from tree.  All studies done during her hospitalization, including a CT scan of the head, appeared normal.  (Tr. 189).  While admitted, Lynch was seen by the Brain Injury Consulting Service with consultations regarding physical, occupational, and speech therapy.  *Id.*  Lynch was discharged in a "significantly improved" condition with instructions to follow-up with Arnold Care for an evaluation of cognitive assessment.  *Id.*  The record does not indicate that Lynch followed-up with Arnold Care for the cognitive assessment; however, she did continue to seek treatment from psychiatrist Dr. Berland following her hospitalization.  No doctor that examined Lynch during her hospitalization noted or imposed any restrictions that would affect Lynch's ability to do work-related activities.

Dr. Berland treated Lynch regularly from June of 1998 until January 2002.  Treatment notes from that time period indicate that Lynch experienced problems with her memory and

concentration, anxiety, and problems with social interactions. *See* (Tr. 325-52).  However, the treatment notes suggest that the severity of these problems fluctuated over the course of treatment and that Lynch showed signs of improvement throughout treatment.  Although Lynch was not working during most of her treatment with Dr. Berland, there is no indication in the treatment notes that Dr. Berland ever instructed Lynch to not work or that he imposed any restrictions or limitations on Lynch's ability to work beyond that determined by the ALJ.  Furthermore, no other treating physician or medical source suggested that Lynch's ability to perform work-related activities before her date insured was limited.

The ALJ's RFC determination accommodates those problems identified in Dr. Berland's notes as being present before Lynch's date last insured.  The ALJ limited Lynch to jobs involving simple instructions and non-detailed tasks, and limited her to occasional interaction with supervisors and co-workers and no regular contact with the public.  These mental limitations are fully supported by the medical evidence in the record that relates to Lynch's condition on or before her date last insured.

The record as whole suggests that Lynch's condition may have deteriorated in the years following her insured status.  If that period of time was the subject of focus for the determination in this matter, perhaps the ALJ's and/or this Court's decision would be different.  However, Lynch's disability must be evaluated based her condition as of March 31, 2004, her date last insured.  *See Fowler*, 866 F.2d at 252.  In considering the evidence relevant to that period of time, the role of this Court is to determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion.  *Davis*, 239 F.3d at 966.  The Court believes that this standard is satisfied, and finds the ALJ's RFC determination to be supported by substantial evidence.

**B.  Dr. Berland's Opinions**

Lynch contends that the ALJ erred in rejecting the opinions of her treating physician, Dr. Berland.  Specifically, Lynch argues that the ALJ failed to follow 20 C.F.R. § 404.1527(d), and relied on factual and logical errors in analyzing Dr. Berland's opinions.  The Court disagrees.

Social Security regulations define a treating source as "[the claimant's] physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. § 404.1502.  Dr. Berland's treatment relationship with Lynch began in 1998.  Treatment records indicate that Dr. Berland treated Lynch consistently from 1998 until January of 2002, then again from 2005 until 2008.  Because of this ongoing treatment relationship, the Court finds that Dr. Berland is a treating source.

Generally, a treating physician's opinion is given controlling weight, but is not inherently entitled to it.  *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).  A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole."  *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007).  "Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation."  *Prosch v. Apfel,* 201 F.3d 1010, 1013 (8th Cir. 2000) (citing 20 C.F.R § 404.1527(d)(2)); *see also* SSR 96-2p.

Here, Lynch does not argue that Dr. Berland's opinions should have been given controlling weight.  Instead, she contends the ALJ should have given Dr. Berland's opinion more weight than he did.  The ALJ found that Dr. Berland's opinions were inherently contradictory with his own treatment notes and the remainder of the medical record.  The ALJ also found that

no neurological or psychological findings in the record support Dr. Berland's conclusions. Therefore, the ALJ gave Dr. Berland's opinion little evidentiary weight. The court finds that this decision is supported by substantial evidence in the record as a whole.

Lynch references four opinions issued by Dr. Berland in arguing that the ALJ erred. The Court notes that each of the opinions was made at least two years after Lynch's date last insured. Lynch first references a medical source statement completed by Dr. Berland on August 18, 2006, in which Dr. Berland stated:

> Lynch experiences fugue and confusion states making it impossible for her to engage in activities requiring sustained mental effort – she also experiences incapacitating depression at times.

(Tr. 326). Dr. Berland also indicated that he had tried various medications to treat Lynch, none of which significantly helped. *Id.* The ALJ expressly rejected Dr. Berland's opinion relating to "fugue and confusion states," finding it unsupported by the medical records since Lynch's alleged onset date and prior to her date last insured. *Id.*

The Court agrees that the medical records do not support Dr. Berland's finding that Lynch experiences "fugue and confusion states." Dr. Berland's treatment notes clearly indicate that Lynch experienced problems with short-term memory, anxiety, concentration, and depression before her date last insured, however, none of the treatment notes mention that Lynch ever complained of or that Dr. Berland observed any fugue states or states of confusion before Lynch's date last insured. Therefore, the Court finds Dr. Berland's opinion relating to "fugue and confusion states" to be inconsistent with his own treatment notes and the ALJ did not err in weighing the opinion. *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) (ALJ was entitled to give treating physician's opinion less weight where the ALJ identified inconsistencies and the opinion was made three years after the claimant's date last insured).

24

The Court does not find that ALJ rejected Dr. Berland's opinion regarding depression, as Lynch alleges.  The ALJ never contested that Lynch experienced depression and acknowledged that the record included reports of depressive episodes.  (Tr. 19).  Therefore, Lynch's contention that the ALJ rejected Dr. Berland's opinion regarding depression is without merit.

The Court also notes that the medical source statement does not include any information from which the Court can determine that Lynch experienced the conditions referenced in the report before her date last insured.  As noted above, the medical source statement was completed over two years after Lynch's insured status had expired.  The information in the medical source statement appears to the Court to relate primarily to Lynch's condition at the time the statement was completed, which was more than two years after her date last insured.  *See Fowler*, 866 F.2d at 252 (Subsequent medical, psychological, and psychiatric evidence is relevant to the extent it reflects upon the claimant's condition as of the date last insured).  Here, the Court cannot say the medical source statement at issue reflects upon Lynch's condition as of her date last insured.  Therefore, the Court cannot conclude the ALJ improperly weighed the medical source statement.

The second opinion referenced by Lynch is a letter written by Dr. Berland on January 25, 2008.  In the letter, which was written nearly four years after Lynch's date last insured, Dr. Berland stated that he had treated Lynch since June 3, 1998, when she went to him for help with her "increasingly debilitating anxiety."  (Tr. 483).  He also opined that Lynch had been unable to work since March of 1999 and stated, "[t]o a reasonable degree of medical certainty, I believe that Ms. Lynch is unable to work and will never be able to work."  (Tr. 484).  The Court first notes that a statement by a medical source that an applicant is "disabled" or "unable to work" involves an issue that is reserved to the ALJ and is not the type of medical opinion that an ALJ must rely on.  *See Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005); *see also* 20 C.F.R. §

404.1527(e).  Therefore, the ALJ did not err in rejecting the opinions that Lynch was unable to work and will never be able to work again.

Also, the Court finds Dr. Berland's opinion that Lynch's anxiety was "increasingly debilitating" is inconsistent with his treatment notes.  Dr. Berland's treatment notes indicate that Lynch consistently complained of anxiety before her date last insured and that Dr. Berland consistently treated her for the condition.  However, Dr. Berland never described the condition as "debilitating," nor did he note any concerns that the condition was worsening or its effects were increasing over the course of treatment.  Furthermore, Dr. Berland's letter provides no factual or medical support for his contention that Lynch's anxiety was "increasingly debilitating."  The Court therefore finds this opinion to be inconsistent with Dr. Berland's own treatment notes and the ALJ did not err in considering the opinion.  *See Cox*, 471 F.3d at 907.

The third opinion referenced by Lynch is a Medical Assessment of Ability to Do Work-Related Activities (Mental) completed by Dr. Berland on May 22, 2008.  The ALJ did not mention this opinion in his decision; however, similar to the medical source statement from August 18, 2006, the Medical Assessment of Ability to Do Work-Related Activities (Mental) does not provide any relevant information about Lynch's condition before her date last insured. The statement appears to the Court to only reference Lynch's condition at the time the statement was completed, which was more than four years after Lynch's date last insured.  *See Fowler*, 866 F.2d at 252 (Subsequent medical, psychological, and psychiatric evidence is relevant to the extent it reflects upon the claimant's condition as of the date last insured).  Therefore, the ALJ did not err in his consideration of this opinion.

Lastly, Lynch references a June 2, 2008 letter written by Dr. Berland.  This letter specifically addresses Lynch's condition before her date last insured and provides an explanation

26

for Dr. Berland's opinion that Lynch was unable to work before January 16, 2002, which was the

last time Dr. Berland saw Lynch before her insured status expired.  Dr. Berland explained that he

based his opinion on four treatment notes between September 21, 2000 and January 16, 2002.

Dr. Berland claims these treatment notes "reflect a worsening anxiety disorder."  Again, the

Court notes that a statement by a medical source that an applicant 'unable to work' is not the

type of medical opinion that an ALJ must rely on.  *Ellis*, 392 F.3d at 994; *see also* 20 C.F.R. §

404.1527(e).  Furthermore, the Court finds substantial evidence in the record to support the

ALJ's decision that this opinion is inconsistent with his own treatment notes.

As discussed above, Dr. Berland never noted in any of his treatment records a belief that

Lynch's anxiety condition was worsening before her date last insured.  This includes the

treatment notes Dr. Berland relies on in his June 2, 2008 letter.  In the last of the treatment notes

relied on in the June 2, 2008 letter, the January 16, 2002 note, Dr. Berland only suggested that

Lynch talk to a yoga teacher; he did not recommend any other form of treatment or note any

concerns that Lynch's condition was worsening.  Furthermore, Dr. Berland never placed any

restrictions or limitations on Lynch while he was treating her. Although the Dr. Berland's

treatment notes contain multiple references to the fact that Lynch was not working, the notes do

not indicate that Dr. Berland ever instructed Lynch to not work, nor that he imposed any

restrictions or limitations that would prevent her from working.  Nevertheless, in 2008, more

than six years after he last treated her before her date last insured, Dr. Berland opined that

Lynch's condition, in 2002, prevented her from working; however, his treatment notes do not

support this opinion.

In *Cox v. Barnhart*, the Eighth Circuit determined that the ALJ was entitled to grant a

treating physician's opinion less weight where the ALJ identified inconsistencies and the opinion

was made three years after the claimant's date last insured.  471 F.3d at 907.  Here, Dr. Berland's

opinion was issued almost four years after Lynch's date last insured, and the opinion, as

discussed above, is inconsistent with Dr. Berland's own treatment notes.  The Court therefore

finds that the ALJ did not err in discrediting Dr. Berland's opinion.

The Court also rejects Lynch's argument that the ALJ erred by failing to consider the

factors set forth in 20 C.F.R. 404.1527(d).  *See Haught v. Astrue*, 293 Fed.Appx. 428, 429 (8th

Cir. 2008) (rejecting argument that ALJ failed to consider the relevant factors enumerated in 20

C.F.R. 404.1527(d) where the ALJ expressed valid reasons for giving the medical opinion little

weight, including that the opinion was not supported by the physician's own treatment records).

## C. ALJ'S Failure to Address Asperger's Syndrome and Depression

Lynch argues the ALJ erred in failing to make specific findings at Step Two regarding

Lynch's Asperger's Syndrome and depression.  Lynch argues that the medical evidence in the

record supports a finding that these "conditions constitute severe impairments or, at a minimum

that Lynch suffers limitations from those conditions."  The court disagrees.

In regard to the ALJ's failure to make specific findings regarding Lynch's Asperger's

Syndrome, the court notes that the ALJ did mention that Lynch sought treatment for Asperger's

Syndrome before her date last insured.[3]  (Tr. 18).  Therefore, it is apparent to the Court that the

ALJ did not overlook the condition.  However, Lynch failed to satisfy her burden of establishing

that her Asperger's Syndrome was a severe impairment before her date last insured.  *See Kirby v.*

*Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) (It is the claimant's burden to establish that his or her

impairment is severe.).  Lynch never expressly alleged Asperger's Syndrome as a basis of

disability and there was no reference to Asperger's Syndrome during her hearing before the ALJ.

---

[3] The ALJ based this statement on a December 2004 medical record in which Lynch told a doctor that she saw a
psychiatrist for Asperger's Syndrome.  According to Lynch, her last visit with the psychiatrist was in 1999.

*See Gregg v. Barnhart*, 354 F.3d 710, 713 (8th Cir. 2003) ("[A]n ALJ is not obliged 'to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability.'" (quoting *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir. 1996))).

Furthermore, the medical evidence in the record does not support a finding that the condition was a severe impairment before Lynch's date last insured.  The record includes very few references to Asperger's Syndrome before Lynch's insured status expired.  Dr. Berland wrote "Asperger" in his treatment notes on three occasions before Lynch's date last insured, twice on June 3, 1998, and once on July 2, 1998.  (Tr. 350-52).  However, Dr. Berland never explains why he made the notations in the treatment records.  Therefore, it is not clear whether the references to Asperger's are a reference to a prior diagnosis or a reference to a diagnosis or observation that Dr. Berland was making.  Regardless, Dr. Berland did not mention Asperger's Syndrome in any of his treatment notes between July 2, 1998 and January 16, 2002, which was the last time he saw Lynch before her insured status expired.  Dr. Berland saw Lynch over twenty times during that three and a half year time period.

Also, the record does not indicate that Lynch sought treatment for Asperger's Syndrome, or any other mental condition, between January 16, 2002 and April of 2005.  *See Page v. Astrue*, 484 F.3d 1040, 1044 (8th Cir. 2007) ("'While not dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem[.]'" (quoting *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995))).  Lastly, Lynch cites to no evidence in the record that establishes any limitations she has that are attributable to Asperger's Syndrome.  The Court therefore finds that Lynch did not prove that, before her date last insured, Asperger's Syndrome was "an impairment . . . which significantly limit[ed] [her] physical or mental ability to do basic work activities . . .." 20 C.F.R. § 404.1520(c).

The Court also finds that the ALJ did not commit reversible error by failing to make specific findings as to depression at step two of the evaluation.  In *Wiese v. Astrue*, the claimant argued that the ALJ erred by failing to analyze the alleged impairments of restless leg syndrome and fibromyalgia in step two of the evaluation process in the severity findings.  552 F.3d 728, 733 (8th Cir. 2009).  The court upheld that ALJ's decision, finding that substantial evidence supported the ALJ's ultimate analysis because the ALJ discussed persistent fatigue, which was the effect of the conditions (restless leg syndrome and fibromyalgia) that the claimant argued were not analyzed.  *Id*.

Here, like *Wiese*, the ALJ considered the effects of the condition that Lynch argues was not analyzed.  At Step IV of the analysis, the ALJ acknowledged that Lynch had "some reports of depressive episodes and some crying spells[.]"  (Tr. 19).  However, the ALJ found that there was no evidence to indicate that those symptoms met the durational requirements to establish a disability.  *Id*.  This finding is fully supported by the evidence in the record because Dr. Berland's treatment records that pre-date Lynch's date last insured do not consistently reference depression or depression symptoms for a one year period and there is no other evidence in the record from the relevant time period that indicates Lynch's depression presented itself for twelve consecutive months.  Therefore, substantial evidence supports the ALJ's ultimate analysis.

Further, the Court notes that no doctor that treated Lynch, including Dr. Berland, imposed any depression related restrictions on her and Lynch does not cite to any evidence that establishes that depression limited her in any way.  The Court also notes that the record lacks any indication that Lynch sought treatment for depression for the final two years of her insured status or the first year after her insured status expired.  *See Page*, 484 F.3d at 1044 ("'While not

dispositive, a failure to seek treatment may indicate the relative seriousness of a medical problem[.]'" (quoting *Shannon*, 54 F.3d at 486)).

Lynch also argues that the ALJ erred in rejecting "additional limitations" arising out her mental impairments.  However, Lynch fails to identify what those additional limitations are.  Further, the ALJ acknowledged in the RFC determination that Lynch was moderately impaired with activities of daily living, social functioning, concentration, persistence, and pace.  (Tr. 17).  He therefore limited Lynch to jobs involving simple instructions and non-detailed tasks, with occasional interaction with supervisors and co-workers and with no regular contact with the public. The Court finds that this RFC fully encompasses any mental limitations that Lynch had before her date last insured.  Therefore, Lynch's argument is without merit.

### D.  Lynch's Husband's Testimony

Lynch argues that the ALJ erred in failing to discuss, analyze or make a credibility finding regarding evidence submitted by her husband.  Lynch's husband submitted a third party function report and testified at the hearing.  The ALJ's decision did not mention any of the evidence or testimony provided by Lynch's husband.

In *Smith v. Heckler*, the Eighth Circuit held that lay evidence "must be specifically discussed and credibility determinations expressed."  735 F.2d 312, 317 (8th Cir. 1984).  There, the court reversed the ALJ's decision because the ALJ failed to discuss the testimony of the claimant's family and others.  *Id*.  However, more recently, the Eighth Circuit has taken a less rigorous approach to an ALJ's failure to address lay witness testimony.  The court has held that although specific articulation of credibility findings is preferable, the lack thereof constitutes a deficiency in opinion-writing that does not require reversal where the ultimate finding is

supported by substantial evidence in the record.  *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

The Court first notes that most of the information contained in the third party function report relates to Lynch's condition at the time the report was completed and does not address Lynch's condition before her date last insured.  *See Fowler*, 866 F.2d at 252 (Subsequent evidence is relevant to the extent it reflects upon the claimant's condition as of the date last insured).  Furthermore, much of Lynch's husband's testimony at the hearing corroborated the testimony provided by Lynch.  *See Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 1998) (Where an ALJ has properly discredited the complaints of the claimant, the ALJ is empowered to reject the cumulative testimony of lay witnesses).[4]

Here, the ALJ's ultimate finding is supported by substantial evidence in the record, even if Lynch husband's testimony is considered.  Therefore, the ALJ's decision is not due to be reversed for his failure to discuss Lynch's husband's testimony.  While the ALJ should have should have specifically addressed the testimony, *see* SSR 96-8p, the Court finds that his testimony would not have affected the outcome of this matter because other substantial evidence in the record supports the ALJ's ultimate decision.  *See  Young*, 221 F.3d at 1068; *see also Robinson*, 956 F.2d at 841 (Arguable deficiency in opinion-writing technique does not require reversal when that deficiency had no bearing on the outcome).

## VI.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports the ALJ's decision that Lynch is not disabled.

Accordingly,

---

[4] The ALJ discredited Lynch's testimony and Lynch does not challenge that determination.

**IT IS HEREBY ORDERED** that the relief sought by Lynch in her Complaint and Brief in Support of the Complaint is **DENIED**. [Doc. 1];[Doc. 10].

**IT IS FURTHER ORDERED** that a separate Judgment shall be entered in favor of Defendant and against Plaintiff in the instant cause of action and incorporating this Memorandum Opinion.

Dated this 7th day of September, 2011.

       /s/ Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE